IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

PHILLIP D. HALE, JR.            )
                                )
v.                              )      NO. 2:06-CV-161
                                )
STEVE BURNS, *et al.*           )


**MEMORANDUM OPINION**

This *pro se* prisoner's civil rights action, brought pursuant to 42 U.S.C. § 1983, was tried by the Court on June 26, 2008, on the issue of an Eighth Amendment violation. Plaintiff, who is now confined in a state prison, was an inmate in the Greene County Detention Center ["GCDC"] when his claims accrued. Of the eight original defendants, six remain. They are: Eddie Tweed, J. B. Morman, Jason Riddle, Jason Armstrong, Jennifer Raider [Greene], and Jeremy Bowman—all employed as officers at GCDC during the time the events precipitating this lawsuit occurred.[1]

Plaintiff contends that his Eighth Amendment right to be free from cruel and unusual punishment was violated when various defendants used excessive force against him by pushing him to the floor; kicking and stomping him; and, while he was handcuffed, spraying him with pepper spray—one eye at a time and from inches away. He further claims that they jerked him up from the floor; took him to the drunk tank, leading him by his hair and, while enroute, slammed his head against everything; and kept him in restraints for one hour before permitting him to shower and wash away the remains of the chemical spray. As

---

[1] Defendants Sheriff Steve Burns and Neal Matthews were dismissed by prior orders; defendant Jennifer Raider has since married and has changed her last name to "Greene."

a result of these purported actions on the part of defendants, plaintiff claims to have sustained a permanent injury to his eyes. After careful consideration of the proof at trial and the record as a whole, the Court makes the following findings of fact and conclusions of law:

1. At the GCDC, some fifty inmates take medication. A nurse prepares an inmate's medication and places it and a small quantity of water, contained in a cup, measuring some 2 inches in circumference and 1 inch in diameter, on a medication cart. Thereafter, the officer who dispenses the medication, rolls the cart to the vestibule—an area which is surrounded by the cells of inmates who receive the medication, and calls the inmates, cell-by-cell, to line up for their medication. The officer then places each inmate's dose of medication and a cup of water on a tray. The tray or slot is constructed of cell bars which have been flattened and attached to the interior of the door. The inmate grasps his medication and water, ingests the medication and, afterwards, replaces the cup on the flat bars, where it is retrieved by the officer for disposal. Inmates in the disciplinary cell are the last group to receive medication.

2. In the early morning hours of July 19, 2006, defendant officer J. B. Morman was distributing medication to inmates, including plaintiff, in GCDC's disciplinary cell. The inmates had formed a line in the vestibule to receive their medication. Plaintiff, waiting in line at the time, asked Morman a question about the disposition of personal effects of an inmate who had departed from the disciplinary cell. Mormon tersely responded that he did not know the answer to the question or that he could not deal with the matter at that time. Plaintiff retorted that Morman should go get another officer, perhaps adding "one that's got some sense." Morman then reached out to retrieve the last inmate's cup, containing some residual water, which had been positioned on the flat bars. In the process of reaching for the

cup, Morman knocked it off the bars, something which has happened many times before. However, this time the cup hit plaintiff in the eye or the torso and, according to plaintiff's testimony, hurt his pride. Plaintiff then responded, "Next time you come through here, I'm going to throw 'feces'[2] on you."

      3. Morman then instructed plaintiff to step to the back of the line, a directive with which plaintiff complied, and defendant officer continued giving medication to the remaining inmates. After completing his task, Morman advised plaintiff that he was going to take him downstairs and opened the door to the vestibule. When plaintiff did not step forward as requested, Morman approached him and grabbed his right arm. Though plaintiff knew he would not be allowed to remain in the cell because of the prior encounter with defendant officer, he nevertheless pulled back, with his hands below his waist, and Morman decided that he needed to handcuff plaintiff.

      4. From his vantage point in the tower, defendant officer Jason Riddle observed Morman signal to plaintiff to step out of the vestibule and he also saw plaintiff backing away. After calling for back-up assistance from other officers, Riddle hastened to the vestibule, where he saw Morman attempting to grasp plaintiff's right hand and plaintiff resisting that attempt. Riddle joined in the fray and propelled plaintiff to the floor. Riddle held plaintiff's legs to the floor, while Morman, now positioned on plaintiff's back, continued his efforts to handcuff plaintiff, who was on his stomach with his arms stiffened to prevent application of the restraints.

      5. Defendant officer Jeremy Bowman was downstairs in the booking area when he heard Riddle's call for back-up. He rushed to the vestibule to assist the other

---

   [2] The word plaintiff actually used in his pleading to denote human waste would be considered coarse slang. Compl. at 3. At trial, however, he used a more socially acceptable word for human excrement.

officers in subduing plaintiff. He was accompanied by defendant officers Eddie Tweed and Jason Armstrong. When Bowman arrived at the scene of the disturbance, he saw that plaintiff was not under control—Morman and Riddle respectively were struggling to apply handcuffs and to restrain plaintiff's legs—and that plaintiff was spitting and resisting all efforts to restrain him. Bowman pulled out his pepper spray, pointed it towards plaintiff's face [which was elevated slightly above the floor and angled towards Bowman], pressed down on the applicator, and released the pepper spray directly into plaintiff's face in a circular motion, at close range, to regain control over plaintiff and to avoid the use of harsher means to curb his resistance. The pepper spray had the desired effect and Morman applied handcuffs to the now-subdued plaintiff. After administering the spray, Bowman helped plaintiff to his feet, and he and other officers placed him, facing the back, into the elevator and escorted him downstairs.

6. Defendant Jason Armstrong, the booking officer, also responded to the call for help. He hastened upstairs, where he found Morman and Riddle on the floor struggling with plaintiff, whose legs were still moving. Armstrong went to the floor and helped restrain plaintiff's legs. Armstrong concentrated on corralling plaintiff's legs and did not "necessarily" see pepper spray being used. Armstrong and Bowman, each with a grip on one of plaintiff's arms, escorted this still-spitting inmate from the vestibule and walked him, with his body stiffened, to the elevator. Some ten to fifteen minutes after plaintiff reached the drunk tank downstairs, he was handed a towel and permitted to shower. At some point, Armstrong ordered plaintiff to place his knees on the bench so that his cuffs could be removed.

7. Defendant Jennifer Greene, nee Raider, who was also in the booking area, likewise responded to the summons for back-up. However, she missed the activation of the

4

pepper spray because, when she arrived at the vestibule, plaintiff was standing in an upright position and walking with his officer escorts out of the vestibule and down the hall. Greene turned around and proceeded downstairs.

8. Defendant Eddie Tweed, the shift supervisor, also answered the call for back-up. When he got to the scene, Morman and Riddle were attempting to restrain plaintiff and plaintiff was still struggling, spitting, and resisting. Because the skirmish was occurring in a constricted space, Tweed stood back and watched the conflict. However, due to a breathing problem, Tweed backed away while the chemical was being sprayed and did not actually witness the application of the pepper spray. After the pepper spray was discharged from its container, plaintiff was somewhat subdued, but he continued to be uncooperative and had to be urged to move forward by the three defendant officers (Tweed, Bowman and Armstrong), who were attempting to escort him downstairs to the drunk tank.

9. Some thirty minutes after the incident, Tweed talked with plaintiff in order to determine his side of the story as to what had instigated the fracas. Plaintiff, seemingly unfrightened and unintimidated, recounted that Morman had thrown a cup in his face. However, he denied having any injury or need for medical attention. At the close of the conversation, plaintiff, now calm, acknowledged that he had messed up and assured Tweed that he would behave if he were returned to his upstairs cell.

10. Tweed also talked to Morman, who admitted that he had knocked the cup off the flat bars, denied that he had been trying to hit plaintiff, and disavowed any knowledge as to whether the cup actually had hit plaintiff. Tweed, finding no support for plaintiff's version of events, concluded that the "cup" incident essentially was "Much Ado About Nothing."

11. Some 30 minutes to one hour after the incident, plaintiff was handed a wet

towel and allowed to shower. He was given a disciplinary write-up as a result of the above events, though later the write-up was dismissed because of a technicality [i.e., the paperwork was not in order].

12. Officers at the GCDC are trained in the proper use of pepper spray. They are instructed that the goal in using pepper spray is simply to hit the target, preferably in the eyes. They are also advised that the appropriate response to an inmate disturbance is to try to regain control without using excessive force, but that the use of pepper spray is proper when employed to prevent an inmate from harming himself or others. An officer may administer pepper spray, without regard to the distance between the cannister and the target.

13. Plaintiff did not file a grievance or a written request for medical treatment with regard to this incident.

14. The Cruel and Unusual Punishment provision of the Eighth Amendment protects prisoners from the infliction of "unnecessary and wanton pain and suffering." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). An Eighth Amendment claim contains both a subjective and an objective component. *Farmer v. Brennan*, 511 U.S. 825, 833-36 (1994). The subjective inquiry is focused on whether the use of force is considered to be punishment, and whether the force constitutes punishment depends, in turn, upon the officer's intent. For example, an officer who uses force in a good faith effort to restore order or discipline after a prison disturbance, regardless of whether the disturbance is major or minor, lacks the intent to punish. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Whitley,* 475 U.S. at 320. On the other hand, if, without provocation, he uses force maliciously and sadistically, intending to cause harm to the prisoner, then the force used amounts to punishment. *Id.*

In order to determine whether force was used in good faith to restore order or maliciously to cause harm, courts must consider "the need for the application of force, the

relationship between the need and the amount of force that was used, and the extent of the injury inflicted." *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321. However, other factors to consider are "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Ibid*.

15. After sifting through the testimony and exhibits offered at trial, the Court finds that Morman reached for the cup with the intent to retrieve it for disposal but that, instead of seizing the cup, he clumsily—not maliciously and sadistically for the very purpose of causing harm—knocked it from its resting place on the flat-barred tray, where it then struck plaintiff in the face, likely in the eye area. Because of the timing of the cup incident (i.e., it occurred after Morman's abrupt and dismissive response to plaintiff's ill-timed question and plaintiff's sharp and seemingly insulting retort that Morman should go get another officer), the Court can understand how plaintiff may have interpreted this trivial incident as a deliberate act on the part of Morman.

16. However, inmates disgruntled by the treatment they receive at the hands of GCDC officers have a means to vindicate any rights which they believe have been transgressed. They may file a grievance against a wrongdoer, describing the actions complained of and asking for a resolution, thereby offering the jail administration an opportunity to redress the matter. What they may not do is respond to an alleged slight or rudeness on the part of an officer by threatening to throw human excrement on him the next time he passes through the cells area.

17. By threatening to toss feces on a GCDC officer, plaintiff had committed a jail infraction. Plaintiff recognized that his retort [the threat] would have repercussions, which would include his being removed from the cell he occupied and being faced with

disciplinary action. Yet knowing that he would have to vacate his cell as a consequence of his threat, he responded to Morman's signal to come forward by doing just the opposite, i.e., he backed away. And he responded to Morman's attempt to apply handcuffs with the same obduracy, by stiffening his arms and body to prevent the application of restraints. He continued resisting, as Riddle took him to the ground and held his legs to the floor and as Morman resumed his efforts to handcuff plaintiff's right hand. Bowman arrived in the vestibule and, observing the officers' scuffle with the still-resisting plaintiff, disbursed pepper spray in plaintiff's face. Morman succeeded in placing the handcuff on plaintiff's right arm.

18. The force applied to plaintiff—physically restraining him, taking him to the ground, holding his legs, grabbing his arms in an effort to apply handcuffs, and using pepper spray, appears to have been fully justified. The force was used because plaintiff had threatened an officer with an act similar to one for which plaintiff previously had been disciplined and had defied all non-violent efforts to remove him from his cell so as to initiate disciplinary procedures. Though the threat was a clear violation of jail rules and, though plaintiff knew he would be punished for this conduct and would have to change cells, he refused to cooperate when signaled to come forward and he actively resisted the officers' attempts to subdue and handcuff him in the presence of other inmates. Some kind of physical force was appropriate under these circumstances. Institutional order is a paramount concern in a correctional facility. A situation involving an out-of-control inmate poses a risk to an orderly functioning institution and the safety of the facility, the staff, and the others inmates because such a situation can soon escalate into something much more serious, e.g., a riot. The questions to be answered now are what amount of force was used and what was the nature of plaintiff's injuries.

19. To answer these questions, the Court relies on the testimony and exhibits offered at trial. All defendants testified that they themselves did not hit, kick, step on or stomp plaintiff, did not lift him from the floor by his hair, and did not bang his head on the sides of walls while escorting him to the drunk tank and that they did not see anyone else do so. Defendants restrained plaintiff merely by using their hands and arms to hold his legs to the floor where he was lying face down, by grabbing his arms to stabilize them sufficiently to apply handcuffs, by lying on his torso to get hold of his arms, and by dispersing pepper spray in his face. Plaintiff testified that he sustained bruises on his back and an injury to his eye that required him to wear glasses, but he did not file a request for medical attention or report the injuries, nor did he file an institutional grievance, complaining about the incident or mentioning any resulting injury. Moreover, he did not wear glasses at trial, explaining that he did not bring them because they were scratched. Even if his eyeglasses were scratched, not wearing them to court where a *pro se* plaintiff might be expected to review pleadings, read documents, and view exhibits is an indication as to how serious he deems his need for glasses to be. Finally, during his interview with Tweed one and a half hours after the incident, he was questioned about his condition and answered that he was fine. Tweed related, in testimony which the Court accredits, that he also asked plaintiff if he needed medical attention or if he was hurt and that plaintiff responded, "No."

Therefore, the Court concludes that plaintiff's injuries were not serious, and this point (i.e., the nature of the injuries) is also relevant to the inquiry into the amount of force used against the defendant.[3] *Hudson*, 503 U.S. at 7. As depicted in the trial record, the

---

[3] The extent of injury is relevant to both components of an Eighth Amendment claim for excessive force—the subjective component (whether the defendant possessed a sufficiently culpable state of mind) and the objective component (whether the defendant's conduct was harmful enough to implicate the Eighth Amendment). *Hudson*, 503 U.S. 1, 8-10.

amount of force used by defendants—while not minimal—does not appear excessive under the circumstances. Instead, the methods chosen to subdue plaintiff and isolate him from the other inmates until he was under control were tempered and proportional response to the situation.

20. Correctional officials are charged with taking reasonable steps to ensure the safety of staff and inmates alike in a "volatile community" which includes, not only first-time offenders and persons convicted of non-violent crimes, but also those who "may have little regard for the safety of others" and who may have a tendency to engage in "antisocial...and often violent conduct." *See Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) (internal quotation marks omitted). In a perfect world, the use of the force depicted in plaintiff's trial testimony would be unnecessary. But, in deference to the defendant officers who were confronted with plaintiff's disruptive conduct, given the institutional environment in which it occurred, *see Wolff v. McDonnell*, 418 U.S. 539, 561 (1974) (noting that a prison is a "closed, and tightly controlled environment peopled by those who...may have little regard for ... the rules), the Court cannot find the amount of force used to be excessive. Thus, the force, seemingly, was needed to resolve a disturbance which indisputably posed a threat to the order of the GCDC and the safety of its inmates and staff. Defendants took the actions they did to restore order to the GCDC, they did not act in a malicious and sadistic fashion for the very purpose of causing plaintiff harm.

Although the Court need not examine whether plaintiff has satisfied the objective element of the claim (i.e, whether the force was "harmful enough"), suffice it to say that he would not have had to prove significant injury. *See Hudson*, 503 U.S. at 8-10 ("Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury"). He, however,

would have had to show more than minimal harm to satisfy this element of his claim. *Id.* at 8-9 (finding that Eighth Amendment allows minimal uses of physical force which are not "repugnant to the conscience of mankind") (quoting *Whitley*, 475 U.S. at 327). While plaintiff may have borne the print of a boot in his back, and an injury to his eye as a result of the strong but quickly-fading after effects of pepper spray, the Court finds that these injuries were, at best, de minimis.

Thus, the plaintiff has not proven the subjective component of his Eighth Amendment claim by establishing facts "that would support a reliable inference of wantonness in the infliction of pain." *Albers*, 475 U.S. at 321. By the same token, he has also failed to satisfy the objective part of his claim.

21. Accordingly, plaintiff has failed to show that defendant officers violated the Eighth Amendment by using excessive force in handcuffing and subduing him or in escorting him to the drunk tank on July 21, 2006, at the GCDC. Therefore, judgment will enter on behalf of defendants and plaintiff shall take nothing on his claims of excessive force.

A separate order will enter dismissing this action.

**ENTER**:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE